March 29. The Judges delivered their opinions.*
JUDGE CARR.
This is a case of Probate. George Redford died at a very advanced age, without wife or child, and possessed of a tract of land, and a number of slaves. A paper was produced to the County Court of Powhatan, purporting to be.the Testament- of Redford. There was no witness to it; but persons were produced to prove that the body of the writing, as well as the signature, were'wholly written by Redford. It is a Testament of personals entirely, no notice being taken of the Testator’s land, and the whole intent *of the paper appearing to be, to give freedom to his slaves, and directions about the dispositions to be made with respect to them, if the Laws did not permit them to remain in the State. Executors were appointed; but, the contest here is, between the slaves seeking Probate, and the Administrator resisting it. The County Ccurt decided,' that the paper was not the last Will of Redford, and ought not to be recorded as such. On appeal, the Superior Court reversed this decision, and directed the paper to be recorded as the last Will and Testament of Redford; from which the appeal is taken to this Court.
In the argument of this cause, there were (among others) two very important questions raised, which I do not mean to consider: 1. Whether the Ecclesiastical Law, with respect to Testaments was the Law of this State: 2. Whether a Testament of personals, written (body and signature) by the Testator himself, can be established on proof by one witness of the hand-writing. I do not examine these points, because I can decide this case with perfect satisfaction to my own mind, without touching them.
The first witness to the hand-writing of the Testator, is Henry Watkins ; and I consider his evidence full to the fact, and given under circumstances entitling it to great weight.' He says that he is well acquainted wih Redford’s hand-writing: that he became familiar with it in 1792, and from thence, for ten or fifteen years, they did much business together; so that the handwriting was nearly as familiar to him as his own ; that after this, the Testator growing old. did much less business of that *705 kind which required him to write more than his name; with his manner of doing which, the witness continued familiar to the time of his death: that he believes the whole Will to be in the hand-writing of Redford: that he knew the signature as soon as he saw it; but, of the body of the Will, he at first had doubts, the hand-writing in tnat part being much changed for the worst, since he was familiar with it. He states then, the course of reflection and ex-amiuation, which, *(with the aid of refreshing his memory by inspection of some papers in his possession known to be written by Redford,) had banished all doubt, and enabled him to speak with confidence. The resort to these papers was not improper; and I repeat, that so far as one witness could go towards it, this handwriting is proved.
Next is the evidence of Claiborne Watkins, who says, “he has seen the Testator write his name frequently to receipts, and believes, from comparison, that the paper now in controversy, with the signature, is wholly in the hand-writing of the Testator; believes he should not have been able to prove the hand-writing of the Testator, except from comparison of the signature with the receipts aforesaid.”
It was objected, that this evidence was not admissible, being founded on comparison of hand-writing.
In the first place, I question whether the strict rule with respect to the admissibility of evidence before a Jury, applies to a Court, who, in a question of Probate, are to judge upon the wbo!e matter, both of law and fact, and who, by their Constitution, are the tribunal in all cases to decide the Taw.
But passing this by, I think that before a Jury, the evidence of this witness would be admissible; its weight, of course, to be greater or less, as to the Jury should seem right. When it is laid down as a rule, that evidence by comparison of hands is not admissible, we must recollect, ’that “by comparison, is now meant a comparison by the juxta-position of two writings, in order, by such comparison, to ascertain whether both were written by the same person.” See Starkie’s Evidence, vol. 2, p. 654, and the cases he cites. Formerly, if a witness, called to prove hand-writing, said he had seen the party write, and believed this to be his hand; this was considered as evidence by comparison of hands, and as inadmissible, at least in criminal cases; as appears from the Statute reversing the attainder of Algernon Sidney; and in the case of the seven Bishops. 4 State Trials, 338. But, such *evidence is clearly admissible now, as legal proof of hand-writing, and considered as distinct from evidence by comparison. This is laid down as settled Law, by Peake, Phillips, and Starkie, and the cases they refer to, to support them. There is also a strong case upon this subject, Eagleton v. Kingston, 8 Ves. 472. Nor do the cases stop here. In Lord Ferrers v. Shirley, Fitzg. 195, Lord Raymond, laid it down, that it was not necessary in all cases, that the witness should have seen the party write, to whose hand he swears; for, if there has been a fixed correspondence by letters, and it can be made out that the party writing such letters, is the same man that attested the Deed, it will enable the witness to swear to that person’s hand-writing, although he never saw him write.
The general rule seems to be, that the best evidence of hand-writing is the witness who actually saw the party write it; but, as this can seldom be had, in its absence, any person may be called to prove the hand, who has, by sufficient means, acquired such a knowledge of the general character of it, as will enable him to swear to his belief, that the writing- in question is the hand of that person; and this knowledge may be acquired from having seen him write, though but once, or from a correspondence with the party on matters of business, or from any other transactions between them; as, from having paid Bills of Exchange, according to his written direction, for which he afterwards accounted. See the cases referred to by 2 Starkie, 651-2-3. This doctrine has been often acted upon also in New Fork.
In Titford v. Knott, 2 Johns. Cas. 211, the Plaintiff called his confidential Clerk to prove the endorsement of the note by the Defendant. The witness testified, that the Plaintiff and the Defendant (who resided in London,) had long been correspondents, and that these letters came to his hands; and though he had never seen the Defendant write, he believed the endorsement to be his hand from the knowledge he had acquired from the correspondence. *The opinion of the Court was delivered by Kent, J., who said, that the evidence was undoubtedly admissible and competent; that it was usual for witnesses to prove hand-writing from previous knowledge of the hand, derived from having seen the person write, and from authentic papers received in the course of business. He added, “if the witness has no previous knowledge of the hand, he cannot then be permitted to decide it, in Court, from a comparison of hands.” The same question was settled in the same way, in Jackson v. Van Dusen, 5 Johns. Rep. 144; Johnson v. Daverne, 19 Johns. Rep. 134; see also, Peake’s N. P. Cas. 21; 1 Esp. Cas. 15, 351-2.
Now, what is the evidence of C. Watkins? That he has frequently seen Redford sign his name to receipts, and believed from comparison, that the body and signature of the Will was wholly written by him. If he had stopped here, there could have been no question about this evidence; for, the comparison spoken of, would have been taken as nothing more than that comparison which every witness must make in his mind, when he testifies in a case of this kind. But he adds, that he believes he should not have been able to prove the hand, except from comparison with the signature to the receipts aforesaid. Now, it must be observed, that this comparison was not made by placing the different papers together, and thus forming an opinion; nor was it made in Court, by a witness having no previous knowledge of the hand, and then for the first time deciding from *706 comparison. But, this was a witness who had often seen the party sign his name to receipts, and who having, as it would seem, those receipts in his possession or power, resorted to them, (I presume after he heard that he was to be examined as to the Will;) and having refreshed his memory by inspecting them, says, on his examination, that he believes the Will is in the hand-writing of Redford. From the cases cited, I believe that this would have been good evidence, if he had never seen the party write. Suppose he had had dealings with Redford, and had paid him *'money, upon which Redford had (though not in his presence,) executed these receipts, and given them to him, he had looked at them, after receiving them, and then put them safely away. Afterwards, on being told that he would be called on to testify as to Bedford's handwriting, he had turned to these receipts, examined them carefully, put them away, and in Court had said, he believed the Will was written by Redford, and stated these facts as the grounds of his belief. The case would have stood upon the same ground with those, where a knowledge was derived from letters in a course of correspondence, or paying bills by his written directions, &c.
But, the case is stronger here; for, Watkins had often seen Redford write; and though he says he believes he could not have proved the hand-writing, without a recurrence to the receipts, he does not say that his present opinion is derived wholly from that source. He might have a recollection of the party’s writing, from having seen him write, but so faint and indistinct, that he could not, from it alone, have proved the Will; and yet, this recollection might form a material ingredient in his present belief. I am decidedly of opinion, that he was an admissible witness.
In addition to this, there are strong and pregnant circumstances, concurring to support the witnesses. In a Deed, dated the 16th of November, 1803, Redford set free a negro-boy named Will. In 1811, he made a Will, by wnich he gave some of his slaves to his wife for her life, and to be free at her death; the best of them to be free on his death. These papers, (proved to be genuine,) taken in connection with the Will of 1818, show a fixed determination, during all that time, to free his slaves. When his wife was living, he gave her some of them for her life; but she being dead, and he having no child, the slaves seem to have been the first objects of his bounty. There are in these papers some other striking peculiarities, strongly indicating that they are the work of the same 331 *hand. One is, his manner of spelling the word emancipate. It is used four times, once in the Deed, twice in the second Will, and once in the last; and each time, it is spelt im-mancy-pate. I have never seen it so spelled before; and I think it a strong circumstance. In addition to this, Redford told Forlines, the year before he died, (which was after the date of this last Will,) that he had made a Will in his wife’s life-time, in which he had given her six or seven negroes; but that since her death, he had made another Will. Nobody speaks of any other than this, except that in 1820; which, though certainly not proved, and too imperfect for any thing, I have a strong impression was written by Redford; and if so, still further shows, how strongly possessed he was of the idea of freeing his slaves. The circumstances on the other side deserves no weight in my mind; and I am clearly for affirming the Judgment.
JUDGE GREEN.
The paper offered for Probate, as the Will of George Redford, is alleged to be wholly written and signed by him. There is no subscribing witness to it, nor any proof that it was acknowledged by him as his Will, to any person whatever; or that any person ever saw it, until after George Bedford’s death. The proofs given to establish the fact, that the Will was wholly in the hand-writing of G. Redford, are the testimony of Henry Watkins and Claiborne Watkins; the first of whom testifies, that he is well acquainted with his hand-writing, and believes that the paper in question was wholly in his hand-writing, including the signature thereto: that he was familiar with his hand-writing from 1792, and for ten or fifteen years did much business with him, and was as familiar with his handwriting as with his own; and after that, becoming old, he did much less business of the sort which required to write more than his name; with his manner of doing which, he ^continued familiar until the time of his death: that in Redford’s general hand-writing, there was a manifest deterioration since he had been in the habit of doing business with him, as aforesaid ; but, that he knew the signature to the Will to be his, as soon as he saw it: that the hand-writing of the body of the Will is so changed, since the witness did much business with him, as aforesaid, that had he seen it without the name and signature, he doubts whether he could have pointed out the Author, and thinks he could not have done so, without some circumstance, other than the writing itself, to point his attention to him : that, if he had been named, he would still perhaps have hesitated to say it was his hand-writing, until his memory was refreshed on the change produced by old age, by reference to other papers, which from time to time the Testator had written, and were in the possession of the witness; and in thus refreshing his memory, the witness says, that the writing, though worse, retains in a good degree its original character; and on close inspection, he now verily believes that the Will is wholly written by the Testator, and he thinks he should have said so without reference to any other paper, but not with that certainty and promptness, that he would have answered as to the signature; that, with respect to the signature to a memorandum at the foot of the Will, the Christian name is unlike the Testator’s writing; so that, seems that without the other, he should have said that he did not write it; but, the surname appears to be written by him, his manner of making the R. being very peculiar.
The other witness testifies, that he has *707 frequently seen the Testator write his name to receipts, and believes from comparison, that the paper in question, with the signature, is wholly in his hand-writing; but, believes he should not have been able to prove the hand-writing of the Testator, except from comparison with the signature to the receipts aforesaid. '“'Upon this evidence, the Appellant insists, that the paper in question is not proved to be in the hand-writing of Redford ; or if it is so proved, it is only proved by one witness, and that the proof of one witness is not sufficient to establish a Testament of personals.
The proof by the first.witness is certainly full to the point. It is sufficient for the proof of hand-writing, that the witness states that he is acquainted with it, showing that he had due means of forming such an acquaintance, and that he believes from that acquaintance, that it is the hand-writing of the person ; and this is the substance of the testimony of the witness. He concludes, that upon close inspection, he verily believes it to be the hand-writing, and thinks he should have said so, without reference to any other paper. That he had actually referred to other papers to refresh his memory, does not impair the validity of his testimony, and but slightly affects its weight. It can hardly be expected, that any cautious and conscientious man would speak promptly and confidently upon such a subject, which is at last only a matter of belief and opinion, without a close inspection of the writing, and refreshing his memory by all means in his power. It is like an acquaintance with the human countenance. We frequently know the face upon first sight, without knowing when or where we have before seen it; and having forgotten to whom it belongs, we are reminded, by circumstances brought to our recollection by some extraneous information, of the name of the person, and the time, place and circumstances of our former acquaintance, which enables us to speak with confidence as to the identity of the person; not upon this information, but upon our own recollection thus refreshed, although time may have made a considerable change in his features. One speaking confidently, under such circumstances, would be entitled to belief, in a degree little, if any, less than one who had a daily and intimate intercourse with the person in question. *1 think the proof of the other witness, incompetent. Although he had seen Redford write, he does not profess to be acquainted with his hand-writing, and declares that his belief is founded on comparison with other writings, which he knows to be genuine; but could not say, that such would be his belief, except from such comparison. His evidence is nothing more than would be that of any other, who compared the writings proved by this witness to be genuine, with the writing in question. I am not however, prepared to say, that in a question of Probate, such a comparison might not be made between writings admitted, or clearly proved (by witnesses above exception, and who had seen them written,) tobe genuine, with the writing in question. Such evidence has, it seems, been usually admitted in the Courts of Probate in England, and they have even called to their assistance in making the comparison, experienced Proctors. There seems to be a difference between submitting such papers for comparison, to the inspection of a Jury, (which cannot be done,) whose judgment on the fact cannot be revised, and to a Court of Probate, whose judgment in that particular may be revised. There is, however, no occasion to consider this question in this cause, sines no such comparison was made in the Court below; the receipts, spoken of by the witness, not being produced.
This, then, presents the question, whether such a Testament can be established, upon the proof of one witness.
The Ecclesiastical Courts of England have jurisdiction of the Probate of Testaments of personals, and proceed, in the exercise of this jurisdiction, according to the Civil Law in respect to Testaments; with this difference, that abandoning the solemnities prescribed by the Civil Law in ordinary cases, they adopted the rules of the Civil Law as to Military Testaments, and applied those rules to all cases indiscriminately. By the Civil Law, soldiers in actual service might make testamentary dispositions, without any solemnity whatever, even without writing, and might revoke *them in like manner.
They might die intestate in part, and in part testate; they might appoint a temporary heir; they might pretermit their own children, and might call any number of witnesses to their Will, many or few, so that there were a sufficient number to prove the fact of the Will, according to the general rule of the Civil Law, which required two witnesses to establish any fact. These privileges were allowed to no others. Vulteius (or Vultijus) in Instituí. 262, sec. 4.* This was the out line of the English Law; and hence the power to dispose of personal property by nuncupative Wills was unlimited, until restrained by the Statute of Frauds of the 29th Car. 2, except as to soldiers and seaman, who were unrestrained by that Statute. 1 Rob. on Wills, 161. Both before and after this Statute, any scrap of paper not signed by the Testator, whether written by himself or another, might be established as a written Will, if it could be proved to have been written or approved by the Testator, animo testandi; and even after the Statute of Wills of Hen. 8, the principles of the Ecclesiastical Law were applied to Wills of land, before the Statute of Frauds; the Common Law Courts only requiring, that it should be in writing, no matter by whom written, nor whether it was signed by the Testator, and attested by witnesses subscribing their names, or not. See the cases collected by Roberts on Wills, 15, 22, 149, 156. The total absence of all solemnity in making testamentary dispositions, which prevailed, was a strong reason for enforc *708 ing the Civil Law rule, that such Testaments could not be established, any more than any other fact, by less than two witnesses to the facts necessary to prove the Will. Otherwise, a single person might dispose of the estate of a decedent, by writing himself any paper, and testifying that it was written by the direction of the deceased, and approved by him as his Will. Accordingly, there is no rule better established in England, than that as a general rule, no Testament can be established upon the evidence of a less number of witnesses than two. *Whether there is an exception in the case of an olo-graph Will, will be the subject of enquiry hereafter.
Bracton lays down the rule in express terms, B, 2, ch. 26, sec. 2, “Eieri debet testamentum liberi hominis, coram duobus vel pluribus viris 'legalibus et honestis, clericis vel laicis, ad hoc .specialter con-vocatis.” In repeated instances, attempts have been made to compel the Ecclesiastical Courts to admit Wills to Probate, upon the proof of one witness, by prohibition ; which has been uniformly denied by the Courts of Common Law, upon the ground, that this being a matter of Ecclesiastical Jurisdiction, it belongs exclusively to them; and according to their Law, a Will cannot be proved by less than two witnesses. Many cases to this effect are collected in all the Abridgements, under the title Prohibition, which it is unnecessary to examine particularly, since all the Elementary Writers agree that this is the general rule.
Upon the settlement of Virginia, all the Laws of England, Common, Statutory, Chancery, Maritime, of Merchants, and Ecclesiastical, so far as they were suited to the circumstances of the society, were introduced with the Colonists. The jurisdiction for the administration of all these Laws, was vested originally in the General Court, consisting of the Governor and Council, and has been gradually distributed, as convenience required, amongst the various Courts established from time to time: but, the transfer of jurisdiction left the principles upon which it was administered, unchanged, and unimpaired. I cannot doubt that the Courts of Virginia, having the Probate of Testaments of personals, were always, and are now, bound to proceed according to the Ecclesiastical Law upon that subject, that being as much a part of the Common Law in its enlarged sense, as it has been adopted here, as the Law Merchant or Chancery Law. The security against fraud, intended by the requisition of two witnesses, was as necessary here as in England. This doctrine, and upon these principles, has been affirmed in Pennsylvania, in the case of Lewis v. Maris, 1 Dall. 278.
*The case of Glasscock, v. Smither & Hunt, 1 Call, 479, is supposed, and at first view seems, to be contrary. But a careful examination of the report, and the original record, and the manuscript note of Judge Pendleton, the President of the Court, will show that this question was not considered or intended to be decided. The paper presented as the last Will, was not written or signed by the Testator; but, a single word was interlined with his own hand. At the same time, a Will previously made and duly executed, was also presented; and the Court below held, that the last paper was not such a “subsequent Will, Codicil, or Declaration in writing,” however proved, as would, under the Act of Assembly, be sufficient to revoke a former Will duly executed. At least, this was considered as the ground of the Judgment by the Court of Appeals, as appears from Mr. Pendleton’s note; and is indicated by the Judgment of the Court, which was pronounced, not on evidence given to the Court of Appeals, (as it must have been, if the validity of the second Will had been in question,) but on the record only. In the first case, the Will must have been finally established or rejected; but, the case was sent back, that the paper might be recorded as a Will, unless it was contested on some other ground. Other than what? Than that it was not a sufficient Will, Codicil, or Declaration in writing, however proved, to revoke the former Will.
The question remains, whether there is in this respect, any distinction between a Will wholly written by the Testator and others. There seems to have been a distinction by the Civil Law, in the case of Military Testaments, between written and unwritten Testaments. “De militis volún-tate, constare potest etiam sine testibus, ex scriptura ipsius; quod si in nulla ap-pareat scriptura nuncupata ejus voluntas, duobus minimum testibus probanda est, non quo modo et qua forma testamentum factum sit, sed testamentum factum esse.” Vulteius, (or Vultajus) 263, sec. Í. The difference seems to me to have consisted *in this; that if the Will was nuncupative, it was necessarily to be proved by at least two witnesses called upon to witness that such was his Will; in the words of Bracton, “ad hoc specialiter convocatis;” but if written, then, whether written by the Testator, or only signed by him, the mere fact of his writing or signing it, proved by any witnesses, (by proving his hand-writing or otherwise, whether they knew it to be. or were called upon to witness it as his Will, or not,) was sufficient to establish it as a Will; but that two were indispensably necessary to that end, as in all other cases to establish any fact whatever. The declaration ■ of Swinburne, p. 300, that if a Will be wholly written, or only subscribed by the Testator, it will be-good without any witnesses at all, can only mean that no subscribing witnesses, nor any called specially to witness that such a Will had been made, were necessary; but that in that case, proof that the Testator had written or subscribed the paper purporting to be a Will, by any person who neither saw him write or sign it, nor heard him declare that it was his Will, or that he had made or signed any Will, would be sufficient proof that it was his Will. It surely did not mean, that no proof of the writing or .subscribing, was necessary; for, without such proof, the Court could not know that it was written or subscribed by him. In giving the proof of the fact of writing or subscribing, two witnesses were *709 necessary to establish the fact, as any other fact in the Ecclesiastical Court. “Unius responsio testis omnino non audiater.” Cod. 4, 20, 9.
It is said, however, by Roberts, p. 199, that where the Will has been wholly written by the Testator, and there are corroborating circumstances, the clear testimony of one witness has prevailed in the Ecclesiastical Court. He cites no authority for this; and if it is so held, this is probably a relaxation of the Civil Eaw rule, as it is relaxed in the Court of Chancery, allowing the Defendant’s Answer to be overruled by .one witness and strong corroborating circumstances. Roberts also states, that it is said that one subscribing *witness is sufficient, but, for this he refers to no authority. In Twaites v. Smith, 1 P. Wms. 10, a Will, proved by one subscribing witness, failed simply on the ground, that there was but one such; the other two being incompetent.
It is however, I think, unnecessary in this case to enquire, how far the original rule requiring two witnesses in all cases, (which, considering the total want of solemnity in the execution of Testaments, ought not,’ in general, to be departed from,) has been relaxed in England, when the Will is wholly written by the Testator, or signed by him in the presence of one subscribing witness, or how far, in the latter case, the rule should be relaxed here; since I think our legislation has a decisive effect upon the question, as to an olograph Will. Such a Will of lands may be established under our Statute, by the proof of one uncontradicted and unimpeached witness; and this is such a legislative declaration that such proof is sufficient for any Will, as, I think, binds the Court conclusively. The maxim, ornne majus continet in se minus, might be well applied.
But it was argued, that as in the case of Eagleton v. Kingston, 8 Ves. 438, so in this, the custody of the paper, and the declarations of the Testator, were sufficient to show, that although written by him, it was either improperly procured from his imbecility, or was not made animo testandi. It seems to me, that the fact is directly the reverse; and that the circumstances show clearly, that it was written as and for his last Will, and in pursuance of a .long settled determination in respect to the disposition of his property. The facts relied upon by the Appellant, are, first, that upon an examination of the Testator’s papers, by various persons examining different parcels at the same time, the paper in question was not found; that they were thrown loose into a box, which was carried to a neighbour’s by one of the slaves emancipated by the Will and the paper af-terwards found upon the top of the papers in the *box; there being a crack in it, through which the paper could have been introduced, although it was locked. Erom this it is inferred, that the paper was in the possession of the slave who carried the box. If the paper was in the box, with the other papers belonging to the Testator, it was in the proper custody ; and I think it very probable, that the examination was very hasty and careless, from the manner in which it was made. But if it were really in the posses-' sionofthe slave, that was no improper custody, but where (if that slave was one in whom the Testator had confidence,) it might well be expected to be found. The testator was a very old and infirm man, without any family, or any one living with him but his slaves. The object of emancipating them, was steadily in his mind for several years; and he might well suppose, that his Will in the hands of one of them, would be safer than with his other papers, which, after his death, might fail into the hands of some one interested, to suppress the Will, which had no provision in it, but to emancipate his slaves. If this were the case, the fact that the slave having the custody of the Will, slipped it into the box, may well be accounted for by the embarrassment, which one ignorant and friendless, and of that class, might feel, as to the proper course to be pursued on such an occasion.
Another circumstance relied on, is, that another paper, dated two years after the paper in question, purporting to be signed and written by the Testator, was produced by another of his negroes, who said he had found it near the gate; and which H. Watkins, the witness who proved the Will of December, 1818, to be in the Testator’s hand-writing, declared he did not believe to be in the Testator’s hand-writing. This paper, in which the words are very badly spelled, and some of them not written with all the letters belonging to them, and in broken sentences, purports to be a Will written in three successive paragraphs, each signed G. Redford, and the first and last dated on the same day. It is hardly intelligible, but may be decyphered. *It gives to Betsey Foriines a mare; and her colt, if she had one, to Jane; a gig and a gig-mare to Lucy Davis; all the cows, to Joseph and Benjamin Davis, except one to Mrs. Jordan; and L. Davis to keep all the cows she already has. It recites, that he is very weak and sick, and sets all his negroes free in each of the paragraphs, and leaves $5 to be equally divided at his death, between Mary and Daniel; and requests Joseph and Lucy Davis to see them righted and set free. This paper is dated only a tew days before the Testator’s death. His Will was offered for Probate on the 21st of December; and it was some days after his death, that the Will was found. I have myself, little doubt, that this paper was also written by the Testator, and given to one of the negroes, when he was, as it states, very sick and weak, and at broken intervals. The spelling is very bad in the papers proved unquestionably to have' been written by him. He was very old and infirm when he wrote the Will in question in 1818; and his hand-writing had then materially changed, though retaining enough of its original character to be identified by those who had before known it. Two years after, upon the eve of dissolution, the character of his writing might well be supposed to have so changed, that none could affirm that they believed it to be his. .If this was *710 a forgery, it affords no presumption that the former was so; for, the person who could .have imitated his hand-writing in 1818, and write intelligibly in his name, could surely have imitated it as well, and written as intelligibly in 1820, as before. He would never have fabricated such a production as that of 1820, when that of 1818, having the same effect was in existence.
Another circumstance relied on, is, that the Testator had frequently declared his hostility to free negroes, and that he would not emancipate any of his, and wished that there were no free negroes in the State, This may be well accounted for. In 1803, he had executed a paper in the form of a Deed of Emancipation of one of his negroes, *which he had kept by him until his death, and which appears to have been intended to operate as a Will; fo*- he desires, that “the said Will be by the Court set free; and that E. Maxcy and H. Maxcy se to the carrying the same into effect;” and noted at the foot, “the above is done at the request of them that is no more.” In May, 1811, he made a Will, afterwards cancelled, by which he gave to his wife a part of his slaves for her life, and then to be free, and if they could not be permitted to stay in the State, he requested his brother to carry them to the county of Shelby, in Kentucky; to enable him todo which, they were to serve him five years. Ail the rest were to be immediately free: and if they could not stay in the State, to serve his brother five year, except Will, the one mentioned in the Deed of 1803, (then only 12 year old,) who was to serve four years; and each to have $5 out of his estate, and his small cart and horse to enable them to remove; his brother living in Shelby county, Kentucky. He gave his land to his wife for life, and the balance, of his property absolutely, but made no further disposition of his land, and begs his Executors, Elisha Maxcy and Josiah For-tines, to use their best endeavours to fulfil his desire, by “trying the Assembly to git them suffered to stay in this Commonwealth, as many of them have husbands and wives to leave behind him, and they are industrious and honest any other slaves.” This was in the Testator’s own hand-writing, and without a witness.
One of the Testator’s negro women had a free negro for a husband, who is proved to have been a bad and troublesome man ; and in consequence of this connection, he sold her in January, 1812. This accounts for his expressions of hostility to free negroes, made subsequently. On the other hand, it is proved, that he was very tender to his slaves, and seemed to feel much for them when distressed; and that the year before he died, he told a witness that he had made a Will in his wife’s life-time, in which he had given her six or seven negroes; but that since his wife’s death, he had made another Will.
*It is impossible to examine the documents and evidence in this cause, without a perfect conviction, that the writing in question is written by the Testator himself, as and' for his last Will, and in pursuance of a long settled determination to that effect. The word emancipate, is uniformly spelled in the same way, in the confessedly genuine writings of the Testator 1803, and 1811, and in that in question, “immancypate;” and the general character of the composition and phraseology of • all these papers are the same, the peculiarity of omitting many of the smaller words is alike in all. But above all. there is a perfect identity of objects in all. In his first Will, of 1811, his wife an*d negroes were the sole objects of his bounty. He left the reversion of his lands after his wife's death, undisposed of. In his last, his wife being •dead, his whole care 'was for the emancipation of his negroes; and he left all the rest of his property undisposed of. He knew there was some obstacle to emancipated slaves remaining in Virginia ; and in the Deed, he appoints persons to solicit the Court to set Will free; and in the two Wills, he provides, that if the General Assembly will not permit his slaves to stay here, they shall be carried to another State, at the expense of his estate, in part by the first Will, and in whole by the last.
The last objection is, that the Will is imperfect ; the Testator not having done all he intended to do, as he concludes the writing, “Witness mv hand and seal,” and failed to affix his seal. This, I think, entitled to no weight; and upon the whole I am clear and confident in the opinion, that the Judgment should be affirmed.
JUDGE COAETER.
This is a case of considerable consequence on the subject of the Probate of Wills, and ought to be examined with caution and deliberation.
fix I could be satisfied that Claiborne Watkins’s testimony was competent, it would relieve me from the consideration of other questions, as to which I have some difficulty. This Will is offered as one altogether in the hand-writing of the Testator. It has never been published in the presence of any witness. It is not enough to prove that the signature is in the handwriting of the Testator; the proof must go to the hand-writing of the whole Will.
A Testament of chattels, written in the Testator’s own hand, though it has neither his name nor seal to it, nor witnesses present at its publication, is good, provided sufficient proof can be had that it is his. hand-writing. 2 Black. Com. 502. What. is sufficient proof of this? According to the Canon Eaw, which is recognized as obligatory on the Common Law Courts, the proof of hand-writing, as well as any other fact, before a Court of Probate, must be by two witnesses. Lea v. Libb, 3 Salk. 396; Twaites v. Smith, 1 P. Wms. 10; Shotter v. Friend, 2 Salk. 547. This, is the Law of England, and was our Law also, obligatory on our Court of Probate, and now obligatory on them, unless it has been altered, as to Wills in the hand-writing of the Testator, by some Statute.
If there are two witnesses in this case to. the hand-writing, we are relieved from the enquiry, whether there has been any alteration in this respect, b}r our Statute.
Henry W. Watkins is undoubtedly one *711 competent witness as to the hand-writing, not only of the signature, but of the whole body of the Will. Is C. Watkins a witness as to either? He says, that he has frequently seen the Testator write his name to receipts, and believes, from comparison, that the paper in controversy with the signature, is wholly in the hand-writing of the Testator; believes he should not have been able to prove the hand-writing of the Testator, except from comparison with the signature to the receipts aforesaid. This is the whole of his evidence as to the handwriting.
*If his evidence is competent, then, whether it is entitled to much or little weight, is not the question now under consideration. There would be two competent witnesses as to the hand-writing, and then the only remaining question would be, as to the sufficiency of the whole evidence to establish the Will. He does not profess to have seen the Testator ever write any thing, except his signature, which he had frequently seen him write; yet, he testifies to the whole body of the Will signature and all. Had he confined his testimony to the signature alone, which, in a case of a Will of chatties, would not be a necessary part of the Will, and had said nothing about the hand-writing of the body of the Will, it could not perhaps be said that there were two witnesses to the hand-writing of the body of the Will. A witness, who has only seen a party write his name, may not be able to form an opinion as to the handwriting of the body of the paper, which, in this case, it is necessary to prove; proof merely of the signature not being enough. But here, the witness undertakes to speak of the hand-writing of the body of the Will, as well as of that of the name subscribed; and although his opinion might not be entitled to very great weight it is still legal and competent evidence, if there is no other valid objection to it. A witness may have very full knowledge of the handwriting, or he may have seen him write only a few words, and only once. The weight of the evidence is one thing; its competency is another. 1 Phill. Evid. 422. But he says, from comparison, he believes it to be his hand-writing; believes he could not have proved the hand-writing, except from comparison with the signatures to the receipts. What kind of comparison he made, does not appear. It does not appear that the receipts were in Court; so that he made the comparison when he gave his evidence. If such was the fact, and if that would alter the case, it ought to have appeared in the Bill of Exceptions. There can be no doubt, I presume, that if a witness knows he is about to be examined as to hand-writing, and *bas frequently seen the party write, and has in his possession papers that he saw him write, and looks at them so as to refresh his memory as to the character and manner of writing, and then deposes, that this would not destroy his testimony. A witness is called on to identify a man he had before known ; but. before he sees him, he looks at a picture which he recognizes to be a likeness; which recals the features and expression of countenance, and notwithstanding alterations by age, &c. he testifies to his identity. He might have been able to identify him, without having looked at the picture; yet, he may think, that was a material aid to him in doing so. He knew him, however, formerly; and on the whole, thinks he is the man. This would be a very different thing from the evidence of one, who never knew him, but who identifies him by a mere comparison with the picture. Why shall a man, because he has seen another write, be better able to judge of hand-writing, than he who is a good judge of writing, and who has on the trial, compared fair specimens of his writing with the paper in question? I suppose it is because he acquires a better knowledge of the character of the hand, by seeing him write, and has a knowledge of it previous to the dispute; and is not governed by a mere juxta-position, and comparison between paper, of which he had no previous knowledge. A witness may believe, that he cannot prove the hand-writing, having no recollection of it, until it is produced to him; and then, he knows it. A witness, having authentic writings in his possession, which he has not seen for many years, may believe that he cannot prove the hand-writing, until he sees those papers, and he may then recollect it. Had the witness said, that on seeing the receipts, though he knew them to have been signed by the Testator, he still had no recollection of the hand-writing, then he could have given no other evidence in the case, than any other judge of writing could have given ; except to prove that the receipts produced had been signed by the Testator, so as to show that they were fair ^specimens of his signature, to compare by. If such was in reality, his testimony, it ought to have been so stated. He has certainly more knowledge on the subject than one who saw him write; and therefore, I cannot say he is incompetent, merely because he had looked at writings known to be writings of the Testator, unless he had gone on to say, that having done so, he still had no recollection of his hand, and spoke entirely from comparing the cne writing with the other; in which case both ought to have been before him at the time he testified ; as must have been the case, had the comparison been made by one who never saw him write. It does not appear, nor can it be presumed in this case, that he had had the Will at his house, and compared the writings, or that he had compared them together in the Clerk’s office where it seems this paper had been lodged for some time before the trial.
On the whole, it seems to me, though not without some doubt that however small the weight due to this evidence, it was competent, and that consequently there were two witnesses to the hand-writing.
This relieves me from the necessity of deciding positively, the very important question, whether, because our Act of Assembly, 1 Rev. Code, 37S, has made a Will, if written altogether by the Testator, a good Will of lands, that the intention was to alter the Law as to the number of witnesses necessary to establish such Will. *712 As at present advised, however, I cannot think it was the intention uE the Legislature to lessen the guards theretofore existing as to the proof of Wilis. It requires two subscribing witnesses as to Wills of lands, where not so written by the Testator; leaving the Law as to personals as it stood before, to wit, that the witnesses need not subscribe, and that the testator need not sign such Will. In other respects, they were left equal, the Law requiring no greater number of witnesses as to Wills of real estates, ■ than those of personals. If Wills of lands were proved here as in England, merely before the Courts of Common Law, some ^argument might be made, that the Common Law mode of proof was intended. But, the same tribunals are to take jurisdiction of Probates of Wills of lands as of personals; and if it was intended to place Wills of lands on a different footing from those of personals, where written by the Testator, or to alter the Law as to the kind of proof in the latter case, it seems to me it would not have been left to mere implication. The man who forges the Will, may prove it.
Prom the view I have taken of this case, it is oerhaps not necessary for me to do more than to suggest my present impressions as to this point.
In addition to the t.vo witnesses in this case, there are strong corroborative cir-cumstinces in favor of this Will, which I need not recapitulate. One has had a good deal of bearing on my mind. The Testator, in all the Wills and instruments which have been produced, has shown an intention to do his own writing. He has never called on any one else to write for him. This shows, that he was apprised that a Will in his own hand-writing was good without witnesses.
The sentence of the Superior Court must be affirmed.
JUDGE CABELL.
It is essential to the proof of hand-writing, that the witness shall be acquainted with the hand-writing which he is called on to establish. The mere fact of having seen a person write, if it did not impart an acquaintance with the hand-writing, is of no importance whatever. I am, therefore, of opinion, that Claiborne Watkins was an incompetent witness.
Upon the other points in the cause, I concur in opinion with Judge Green ; and he has gone so fully into them, as to leave me nothing new to add.
I am of opinion, to affirm the Judgment.

The President absent.

This Author is a German Commentator on the Institutes of Justinian. His Work, which is written in Latin, is very rare and ancient. The title is “Hermanni Vultc/ii. J. C. In Institutiones juris civilis a Justiniano compositas, Commentarius.” It was printed at Marburg-, in Hesse, in 1605.